**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:23-cv-00097-MR**

| | | |
|---|---|---|
| **BLUE SKY ENDEAVORS, LLC AND LAMOND FAMILY MEDICINE, P.L.L.C.,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | <u>**ORDER**</u> |
| **HENDERSON COUNTY HOSPITAL CORPORATION AND BLUE RIDGE COMMUNITY HEALTH SERVICES, INC.,** | ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

THIS MATTER is before the Court on the Plaintiffs' Motion for a Preliminary Injunction. [Doc. 32].

I.  **PROCEDURAL BACKGROUND**

On April 6, 2023, the Plaintiff Blue Sky Endeavors, LLC ("Blue Sky Endeavors") filed a Complaint in Henderson County Superior Court. [Doc. 1-1 at 1]. In its Complaint, Blue Sky Endeavors alleged that Henderson County Hospital Corporation ("Pardee Hospital") and Blue Ridge Community Health Services, Inc. ("Blue Ridge") (collectively, the "Defendants") infringed

Blue Sky's trademark, and thereby engaged in unfair competition and unfair and deceptive trade practices.  [Id. at 10].  Four days later, the Defendants removed the case to this Court.  [Doc. 1 at 1].  After months of litigation, on February 28, 2024, Blue Sky Endeavors amended its Complaint, adding LaMond Family Medicine, P.L.L.C. ("LFM") (collectively with Blue Sky Endeavors, the "Plaintiffs") as a plaintiff.  [Doc. 26 at 1].  The Defendants answered the Amended Complaint on March 12, 2024.  [Doc. 28].

On July 29, 2024, the Plaintiffs filed the present Motion for a Preliminary Injunction (the "Motion").  [Doc. 32].  In their Motion, the Plaintiffs ask the Court for one of two injunctions: "either (1) a preliminary injunction from Defendants providing all services under the [mark "Pardee BlueND"] or (2) a preliminary injunction from Defendants providing the new scope of medical services, specifically, endocrinology, neurology, and rheumatology." [Doc. 48-1 at 5].  On August 20, 2024, the Defendants filed a Response to the Motion, [Doc. 47], and on August 22, 2024, the Plaintiffs filed a Reply, [Doc. 49].  This matter is now ripe for disposition.

## II.    STANDARD OF REVIEW

Injunctions are "an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  Thus, injunctive relief is a matter of discretion with the Court.  See Metro. Reg'l Info. Sys.,

2

Inc. v. Am. Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013). A plaintiff seeking interim injunctive relief must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent injunctive relief, (3) the balance of the equities tips in its favor, and (4) the injunction would be in the public interest. Winter, 555 U.S. at 20.

The first two factors are the "most critical." Nken v. Holder, 556 U.S. 418, 434 (2009). For the first factor, a plaintiff "need not establish a 'certainty of success,' but must make a clear showing that he is likely to succeed at trial." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017) (citing Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013)). For the second factor, a plaintiff "must make a 'clear showing of irreparable harm . . . , and the required irreparable harm must be neither remote nor speculative, but actual and imminent.'" Scotts Co. v. United Indus. Corp., 315 F.3d 264, 283 (4th Cir. 2002) (alteration in original) (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991)). Courts should not issue injunctive relief if the plaintiff fails to show irreparable harm. See id. at 271 (citing Safety–Kleen, Inc. (Pinewood) v. Wyche, 274 F.3d 846, 859 (4th Cir. 2001) and Direx, 952 F.2d at 812 (stating that courts should only consider the equities and public interest if the plaintiff shows irreparable harm).

3

## III. FACTUAL BACKGROUND

Blue Sky Endeavors owns the mark "Blue Sky MD" (the "Plaintiffs' Mark"), a registered trademark, [Doc. 32-4; Doc. 32-5; Doc. 26-1], and LFM is the sole licensee of the Plaintiffs' Mark, [Doc. 26 at 9–11]. In their Amended Complaint,[1] the Plaintiffs include several images of the Plaintiffs' Mark. Below is one example:



[Doc. 26 at 5]. In describing the goods or services identified by the Plaintiffs' Mark, the trademark registration's "Statement of Use" states the following:

> Medical clinic providing weight loss solutions, services and programs, nutrition counseling, hormone therapy, including, bioidentical hormone

---

[1] The Amended Complaint is verified. See Hebb v. City of Asheville, 655 F. Supp. 3d 388, 394 (W.D.N.C. 2023) (citing IDS Life Ins. Co. v. SunAmerica Life Ins. Co., 136 F.3d 537, 542 (7th Cir. 1998)) ("At a preliminary injunction stage, allegations set forth in a verified complaint are treated the same as affidavits.").

4

replacement, anti[-]aging therapy, and natural hormone therapy, medical aesthetic procedures, including, laser[ ]hair removal, laser peels, botulinum toxin treatments, microdermabrasion, liposuction, vein treatments, vein therapy, cellulite treatments, body contouring treatments, injectable filler treatments, facials, and skin care.

[Doc. 32-5].

LFM provides healthcare services in the Western North Carolina area surrounding Henderson and Buncombe Counties. [Doc. 26 at ¶ 11]. In 2004, David LaMond opened LFM and began operating under the Plaintiffs' Mark in 2008. [Doc. 32-6: LaMond Decl. at ¶¶ 3–6]. LFM is associated with three different brands: the Plaintiffs' Mark, "Blue Sky MD Health," and "DermaBlue." [Doc. 45-2: Hunter Dep. at 14]. LFM, however, is one entity, and its "main brand" is the Plaintiffs' Mark. [Id.]. According to LaMond, LFM is synonymous with the Plaintiffs' Mark. [Doc. 32-6: LaMond Decl. at ¶ 6]. Third parties also recognize LFM through the Plaintiffs' Mark, [Doc. 33-3: Allison Dep. at 17–18], and LFM employees refer to LFM as "Blue Sky MD," [Doc. 33-4: Nanney Dep. at 84].

According to Jake Hunter, LFM's president, LFM offers various services, including dermatology, hormone therapy, weight management, and traditional primary care. [Doc. 45-2: Hunter Dep. at 14–16]. "At a high level," though, the Plaintiffs' Mark is associated with hormone therapy and weight

management.  [Id. at 16].  Under the Plaintiffs' Mark, LFM markets itself as a "medical weight loss clinic."  [Doc. 26 at 3–4].  Nonetheless, LFM offers a "comprehensive plan" under the Plaintiffs' Mark; services like hormone therapy and weight management go "hand in hand" with LFM's "traditional primary care" services.  [Doc. 45-2: Hunter Dep. at 16].  If a potential patient is unable to pay for LFM's services, however, LFM refers the potential patient to "health centers" like Pardee Hospital.  [Id. at 19–20].

Pardee Hospital is a nonprofit healthcare provider that operates in Western North Carolina as a "primary care physician network."  [Doc. 44-5: Reed Decl. at ¶¶ 3–4, 16].  Pardee Hospital "provides a broad range of primary and preventive health care services," [Doc. 33-5 at 2], and operates thirteen primary-care offices, [Doc. 44-5: Reed Decl. at ¶ 13].  Pardee Hospital and LFM have some similarities.  For example, Pardee Hospital and LFM both provide, at least in part, primary-care services, and market themselves online.  [Doc. 45-2: Hunter Dep. at 14–16; Doc. 33-5 at 2; Doc. 32-12; Doc. 32-13].  Employees have left LFM to work for Pardee Hospital. [Doc. 32-6: LaMond Decl. at ¶ 8; Doc. 32-8: Boren Dep. at 32–35; Doc. 33-1: Jones Dep. at 122–23].  Indeed, one former LFM doctor now works for Pardee Hospital, where he performs the same services that he performed at LFM.  [Doc. 45-2: Hunter Dep. at 270–71, 281].  Moreover, in August of 2022,

6

Pardee Hospital offered to purchase LFM, but LFM declined. [Doc. 32-6: LaMond Decl. at ¶ 12]. Despite any similarities between Pardee Hospital and LFM, neither party suggests that a patient has received services from Pardee Hospital instead of LFM because the patient mistook Pardee Hospital for LFM. [See Doc. 45: LaMond Dep. at 114–15; Doc. 44-5: Reed Decl. at ¶¶ 50–52; Doc. 26-7: Lewis Decl. at ¶ 13; Doc. 26-6: Boren Decl. at ¶ 13].

The Defendant Blue Ridge is also a nonprofit healthcare provider. Blue Ridge is a Federally Qualified Health Center ("FQHC"), which means that it provides the "same high quality healthcare services to uninsured and underinsured patients that it offers to those with insurance." [Doc. 44-5: Reed Decl. at ¶ 5]. In 2022, Pardee Hospital and Blue Ridge contracted to "make Pardee Hospital a sub-recipient of Blue Ridge's FQHC status." [Id. at ¶ 6; Doc. 33-5 at 2]. Since then, Pardee Hospital has provided healthcare services "regardless of an individual's or a family's ability to pay." [Doc. 44-5: Reed Decl. at ¶ 9]. Pardee Hospital operates under the mark "Pardee

BlueMD" (the "Pardee Mark"), [id. ¶ at 10].² Below is an image of the Pardee Mark:

Pardee BlueMD

[Doc. 26 at 7].³

Johnna Reed is the both the chief administrative and chief executive officer of Pardee Hospital, [Doc. 44-5: Reed Decl. at ¶ 2], and she chose the Pardee Mark, [id. at ¶ 15]. Reed chose the Pardee Mark to capitalize "on the over 70 years of recognition that people in the region have regarding Pardee and medical services," to reference the Blue Ridge Mountains of Western North Carolina, and to reference "Carolina Blue," which is associated with Pardee Hospital's administrative partner, UNC Health. [Id. at ¶ 16].

---

² The Plaintiffs argue that Pardee Hospital also uses the mark "Blue MD." [Doc. 48-1 at 4]. Indeed, in their Reply, the Plaintiffs argue that "[t]his litigation is regarding the use of 'BlueMD' not 'Pardee.'" [Doc. 49 at 8]. For this proposition, the Plaintiffs cite Pardee Hospital's webpage and point to instances of "Blue MD" used in "embedded key words." [Doc. 32-7]. The Plaintiffs also cite Pardee Hospital's internal shorthand use of "Blue MD" instead of "Pardee Blue MD." [Doc. 32-8 at 85; Doc. 33-6]. In their Amended Complaint, however, the Plaintiffs never allege that the Defendants infringed on the Plaintiffs' Mark by using only "Blue MD," unattached to "Pardee." [See Doc. 26]. Further, none of the Plaintiffs' citations indicate that Pardee Hospital presents itself to the public as only "BlueMD." Accordingly, the Court will only address Pardee Hospital's use of the Pardee Mark, "Pardee BlueMD."

³ This image is from the Amended Complaint, and it appears to be from Google reviews. [See also Doc. 32-13 (showing images of Google reviews of Pardee Hospital)]. Neither the Plaintiffs nor the Defendants offer additional images of the Pardee Mark.

8

Pardee Hospital's marketing director, Somer Lorenz, told Reed that "marketing under just the name 'BlueMD' might be a mistake," however. [Id. at ¶ 18]. In fact, Lorenz told Reed that she did not "recommend BlueMD since you have Blue Sky MD and Blue Sky Health MD in this area." [Doc. 33-6 at 2–3]. Reed stated, however, that Lorenz "had no objection or concern related to calling the FQHC primary care physician network 'Pardee BlueMD.'" [Doc. 44-5: Reed Decl. at ¶ 18].

Erica Allison works for a company called "Formation," which "is a strategic communications agency that offers both public relations and branding services." [Doc. 33-3: Allison Dep. at 10–11]. Among other things, Formation consults clients concerning possible logo designs. [Id. at 11–12]. Through Formation, Allison has worked for both LFM and Pardee Hospital; LFM is a former client, and Pardee Hospital is a current client. [Id. at 16]. Concerning her work for Pardee Hospital, Allison's "lane was not about branding and naming. [Her] role was about PR." [Id. at 37]. Even so, Allison had "concerns" about the Pardee Mark, and she expressed her concerns to Lorenz. [Id.].

Nonetheless, Pardee Hospital began operating under the Pardee Mark on September 1, 2022. [Doc. 44-5: Reed Decl. at ¶ 22]. After Pardee Hospital began using the Pardee Mark, Holley Nanney, an LFM employee,

9

received multiple phone calls from people who got LFM and Pardee Hospital "mixed up." [Doc. 33-4: Nanney Dep. at 74–75, 84]. When one LFM patient saw that Pardee Hospital had rebranded under the Pardee Mark, she expressed the belief "that Pardee Hospital had partnered with [LFM]." [Doc. 26-6: Boren Decl. at ¶ 11]. Another patient expressed the same belief, in part because when she searched for LFM online, her search engine presented her with a link for the Pardee Hospital website. [Doc. 26-7: Lewis Decl. at ¶¶ 11–12; Doc. 32-15: Lewis Dep. at 53–54]. A different patient considered leaving LFM because he believed that Pardee Hospital had purchased LFM. [Doc. 33-1: Jones Dep. at 112–13]. Moreover, some Pardee Hospital employees believed that Pardee Hospital had purchased LFM. [Doc. 32-6: LaMond Decl. at ¶¶ 15–16; Doc. 33-1: Jones Dep. at 117–22].

LFM, through its Chief Marketing Officer Travis Wiley, conducted an internal survey about possible patient confusion between itself and Pardee Hospital. [Doc. 33-8: Wiley Exp. Rep. at ¶ 3]. In an unverified report submitted by the Plaintiffs, Wiley states that the survey showed that over 21% of the LFM patients surveyed reported confusion because of the Pardee

Mark.  [Id. at ¶ 35].[4]  Wiley also opined that LFM received less internet traffic after Pardee Hospital started using the Pardee Mark in September of 2022. [Id. at ¶¶ 25–34].  However, the evidence indicates that LFM's net income increased from $2,359,951 in 2022 to $5,397,108 in 2023.  [Doc. 45-1].  At the same time, LFM's advertising expenses decreased from $1,132,434 to $971,159.  [Id.].

Going forward, Pardee Hospital intends to offer three new services: endocrinology, neurology, and rheumatology.  [Doc. 44-5: Reed Decl. at ¶¶ 40–41].  These applied-for services are designed to address the critical shortage of endocrinology providers in Western North Carolina and include services related to cancers, diabetes, bone health, parathyroid disease, and pituitary and adrenal gland disorders. Pardee Hospital would also employ actual endocrinologists to provide these services.  [Doc. 44-5: Reed Decl. at ¶¶ 44, 46]. The Plaintiffs present no evidence that LFM offers neurological or rheumatological services, but LMF does offer endocrinological services in the form of hormone therapy related to weight loss.  [Id. at ¶ 45; Doc. 45-2: Hunter Dep. at 14–16].  Pardee Hospital expected final approval for these

---

[4] The Plaintiffs submit Wiley's report as one of a retained "expert witness," although it appears that he is also an officer of LFM.  Wiley's report appears to be unverified.  It is also unclear from the Plaintiffs' submissions what Wiley's area of expertise is purported to be.

new services by July of 2024, but approval for these services was still pending as of August 19, 2024. [Doc. 44-5: Reed Decl. at ¶ 41]. In an effort to prevent Pardee Hospital from extending the services offered under the Pardee Mark, the Plaintiffs filed the present Motion. [Doc. 49 at 4].

## IV.   DISCUSSION

### A.   Irreparable Harm

The Plaintiffs filed the present Motion nearly two years after Pardee Hospital began using the Pardee BlueMD name and almost sixteen months after the original Complaint was filed. The Plaintiffs' delay in seeking injunctive relief weighs against a finding of irreparable harm. See John Lemmon Films, Inc. v. Atl. Releasing Corp., 617 F. Supp. 992, 996 (W.D.N.C. 1985) (stating that delay in seeking injunctive relief "belied [the plaintiff's] claim that there is an urgent need for speedy action to protect its rights"); see also Epic Tech, LLC v. Raleigh Startup Sols. LLC, No. 5:23-CV-136-D, 2023 WL 4492495, at *4 (E.D.N.C. June 5, 2023), report and recommendation adopted, 2023 WL 4611803 (E.D.N.C. July 18, 2023) (holding that failure to promptly seek preliminary injunction "undercuts [the plaintiffs'] assertion that irreparable harm is likely to result").

The Plaintiffs argue that they delayed seeking injunctive relief until after discovery because they "incorrectly believe[ed] that Defendants, after seeing

12

actual evidence of confusion, would relent in [their] endeavors….” [Doc. 32-1 at 30]. The Plaintiffs' misplaced belief in this regard, however, does not excuse their decision to wait nearly sixteen months after initiating this action to seek injunctive relief. The Plaintiffs also attempt to justify their delay by claiming Pardee Hospital's recent supplemental interrogatory responses "forced their hand" due to the Defendants' disclosure in discovery that Pardee Hospital has applied to provide a new range of medical services in the region, particularly endocrinology, neurology, and rheumatology. The Plaintiffs, however, do not purport to offer neurological or rheumatological services. Moreover, the Plaintiffs have failed to demonstrate that the wide range of endocrinology services that Pardee Hospital plans to offer—related to cancers, diabetes, bone health, parathyroid disease, and pituitary and adrenal gland disorders—are the same as the hormone therapy provided by LFM for the purpose of weight loss.

For all these reasons, the Court concludes that the Plaintiffs have not established the irreparable harm needed to support their requested relief.

## B. Likelihood of Success on the Merits

In addition to failing to show a likelihood of irreparable harm, the Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their infringement claims.

13

The Plaintiffs assert three causes of action, but the Plaintiffs' second and third claims are derivative of its first,[5] namely, that the Defendants are infringing the Plaintiffs' Mark, in violation of the Lanham Act. [Doc. 26 at 9–11]. The Lanham Act is "the core federal trademark statute," Jack Daniel's Properties, Inc. v. VIP Prod. LLC, 599 U.S. 140, 145 (2023), and it provides a civil cause of action for damages caused by trademark infringement, see 15 U.S.C. § 1114. Trademark infringement requires a plaintiff to prove:

> (1) that it owns a valid mark; (2) that the defendant used the mark "in commerce" and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers.

Rosetta Stone Ltd v. Google, Inc., 676 F.3d 144, 152 (4th Cir. 2012) (quoting 15 U.S.C. § 1114(a)). The only disputed element in this case is the fourth element of confusion, which is the "keystone" of trademark infringement. Jack Daniel's, 599 U.S. at 147.

Likelihood of confusion "is an 'inherently factual' issue that depends on the facts and circumstances in each case." Lone Star Steakhouse & Saloon,

---

[5] The Plaintiffs' second cause of action is for unfair competition, and their third cause of action is for unfair and deceptive trade practices in violation of North Carolina law. [Doc. 26 at 10–11].

14

Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 933 (4th Cir. 1995) (citing

Anheuser–Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 318 (4th Cir. 1992)

and Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1356 n. 5 (9th Cir.

1985)).   The Fourth Circuit considers nine factors to discern whether

confusion of marks is likely:

> (1) the strength or distinctiveness of the plaintiff's
> mark as actually used in the marketplace; (2) the
> similarity of the two marks to consumers; (3) the
> similarity of the goods or services that the marks
> identify; (4) the similarity of the facilities used by the
> markholders; (5) the similarity of advertising used by
> the markholders; (6) the defendant's intent; (7) actual
> confusion; (8) the quality of the defendant's product;
> and (9) the sophistication of the consuming public.

George & Co., LLC v. Imagination Ent. Ltd., 575 F.3d 383, 393 (4th Cir. 2009).

"These 'factors are not always weighted equally, and not all factors are

relevant in every case.'"   Rosetta Stone, 676 F.3d at 154 (quoting Louis

Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 259 (4th Cir.

2007).  Therefore, courts should only analyze the relevant factors.  Id. at 154

(citing Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984)).

The Court now turns to the relevant factors.[6]  With respect to the strength and distinctiveness of the Mark, the Plaintiffs have made a showing that their Mark has significant secondary meaning.  See Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990).  However, the Plaintiffs' and Defendants' Marks appear to be dissimilar.  In the Plaintiffs' Mark, "blue sky" is lowercase, the stem of the "b" is fragmented, and "MD" is superscript.  In the Pardee Mark, "Pardee Blue" is written with initial capital letters, no letters are fragmented, and "MD" is on the same line and of the same size as the other words of the mark.  The Marks are also in different font.  Both Marks contain the word "blue" and the initialism "MD," however.  Thus, because both Marks contain "blue" and "MD," the Marks sound similar concerning that word and that initialism.  On the other hand, the Plaintiffs' Mark contains "sky"; whereas the Pardee Mark contains "Pardee."  These words are dissimilar in sight and sound.  While the Marks contain some similarities, overall the Marks contain more dissimilarities than similarities.  This factor, therefore, does not weigh in favor of a finding of a likelihood of confusion.

---

[6] Upon review of the record, the Court finds that several of the factors listed—including the similarity of the facilities and advertising used by the markholders and the sophistication of the consuming public—are simply not relevant to the present inquiry.

As for the similarity of the services identified by the respective Marks, the evidence presented shows that the Defendants offer comprehensive health care services to residents throughout the area, regardless of their insurance status or their ability to pay. By contrast, LFM specializes in a narrow field of services, including dermatology, hormone therapy, weight management, and traditional primary care. Critically, LFM's services are not made available to patients regardless of their ability to pay. While there is some overlap between the parties' services, the core services provided by LFM is outside of the scope of the Defendants' broad plan, and LFM makes a point of marketing itself as providing services that the Defendants do not— and which the public generally would not expect from the Defendants as opposed to a specialist. For these reasons, the Court finds this factor does not weigh in favor of a finding of a likelihood of confusion.

As for intent, the Defendants have presented evidence that the Pardee Mark was chosen to capitalize "on the over 70 years of recognition that people in the region have regarding Pardee and medical services," to reference the Blue Ridge Mountains of Western North Carolina, and to reference "Carolina Blue," which is associated with Pardee Hospital's administrative partner, UNC Health. [Doc. 44-5: Reed Decl. at ¶ 16]. Reed's declaration is strong evidence that Pardee Hospital did not choose the

17

Pardee Mark in order to confuse consumers.  See George & Co., 575 F.3d at 397.  Thus, this factor weighs against a finding of a likelihood of confusion.

Finally, the Court turns to the issue of actual confusion.  "[E]vidence of actual customer confusion 'is patently the best evidence of likelihood of confusion.'"  Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc., 87 F.3d 654, 660–61 (4th Cir. 1996) (quoting Allied Marketing Group, Inc. v. CDL Marketing, Inc., 878 F.2d 806, 813 (5th Cir. 1989)).  "Actual confusion can be demonstrated by both anecdotal and survey evidence."  George & Co., 575 F.3d 383, 398 (citing Tools USA, 87 F.3d at 661).

The Fourth Circuit analyzes evidence of actual confusion through the eyes of "the ordinary customer."  Lamparello v. Falwell, 420 F.3d 309, 316 (4th Cir. 2005) (quoting Anheuser–Busch, 962 F.2d at 319).  Survey evidence demonstrating confusion among ordinary customers is probative of actual confusion.  RXD Media, LLC v. IP Application Dev. LLC, 986 F.3d 361, 373 (4th Cir. 2021).  The Fourt Circuit has previously "explained that survey evidence demonstrating confusion in 10% or more of consumers supports a finding that actual confusion exists."  Id. (quoting Sara Lee, 81 F.3d at 467 n.15).  Indeed, "a 'confusion rate of 17 percent' is 'clear evidence of actual confusion for purposes of summary judgment.'"  Id. (quoting Rosetta Stone, 676 F.3d at 159).

18

The Plaintiffs have presented evidence that after Pardee Hospital began using the Pardee Mark, LFM received multiple phone calls from people who got LFM and Pardee Hospital "mixed up." [Doc. 33-4: Nanney Dep. at 74–75, 84]. This evidence, though, is simply "initial interest confusion" because any confusion was easily "dispelled" before anyone was served by the wrong provider. See Lamparello, 420 F.3d at 315–16.

The Plaintiffs also have presented evidence that some LFM patients believed "that Pardee Hospital had partnered with [LFM]" [Doc. 26-6: Boren Decl. at ¶ 11], and that one LFM patient considered leaving LFM because he believed that Pardee Hospital purchased LFM.[7] [Doc. 33-1: Jones Dep. at 112–13]. While this evidence tends to show some confusion, it is largely anecdotal and is difficult to quantify. Moreover, the Plaintiffs have offered no evidence that the anecdotal evidence of confusion experienced by some of their patients had any significant duration. As such, the Plaintiffs' evidence of actual confusion is not very persuasive.

---

[7] The Plaintiffs point to LFM's internal survey, which indicates that approximately 21% of LFM's surveyed patients reported confusion because of the Pardee Mark. [Doc. 33-8: Wiley Exp. Rep. at ¶ 35]. The Court discounts this evidence because nothing was presented to show that such survey was conducted in a manner as to be statistically relevant or what expertise the surveyor, Wiley, has, particularly noting that he is an employee of the Plaintiff medical practice.

19

After weighing all of the relevant factors, the Court concludes that the Plaintiffs have failed to show a likelihood of success of prevailing on their claims arising from the Defendants' purported infringement.

## C. The Equities

The Defendants have presented evidence that a name change—even if temporary—would have severe consequences for Pardee Hospital's ability to operate its primary care physician network and to provide care to indigent patients. Further, the Defendants have presented evidence that inhibiting an FQHC from offering critically needed medical services (e.g., endocrinology) would potentially harm public health.[8]  By contrast, the evidence shows that LFM has continued to increase its profits during the time period that the Defendants have used the allegedly infringing Mark.  Furthermore, the Court has already found that the Plaintiffs' have failed to show any irreparable harm arising from the Defendants' conduct. Therefore, the Court finds that the balance of equities favors the Defendants.

## D. The Public Interest

The Defendants have presented evidence that changing the name of Pardee Hospital's primary care physician network would result in multi-month

---

[8] This is particularly true considering the prevalence of diabetes among the general population and that the Defendants serve indigent patients, whereas the Plaintiffs do not.

delays in receiving payments from Medicaid and Medicare, causing significant financial stress on Pardee Hospital, which has operated at a loss in both 2022 and 2023; that such financial duress would force it to evaluate whether to close primary care offices and limit services to account for the loss of revenue; and that a name change would also cause additional costs related to updating its electronic medical system and the physical rebranding of its office locations. [Doc. 44-5: Reed Decl. at ¶¶ 26-33]. Further, the Defendants have presented evidence that preventing the hospital from offering endocrinology, neurology, and rheumatology services would deprive patients of critical care for chronic ailments like diabetes and cancer. [See id. at ¶ 32]. This would negatively impact patients in Western North Carolina who depend on Pardee Hospital to provide medical care regardless of their ability to pay. [Id.]. Accordingly, the Court concludes that issuing the requested preliminary injunction is not in the public interest because it would unduly harm Pardee Hospital and the patients who rely on it for medical care.

## V.    CONCLUSION

In sum, the Court concludes that the Plaintiffs have failed to show that they will be irreparably harmed without injunctive relief. Further, the Plaintiffs have failed to demonstrate a likelihood of prevailing on the merits of their claims. Additionally, the equities and the public interest weigh against issuing

the requested relief. Accordingly, in its discretion, the Court denies the Plaintiffs' Motion.

**ORDER**

**IT IS, THEREFORE, ORDERED** that the Plaintiffs' Motion for a Preliminary Injunction [Doc. 32] is hereby **DENIED.**

**IT IS SO ORDERED.**

Signed: October 19, 2024

Martin Reidinger
Chief United States District Judge