# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:23-cv-00097-MR

| | | |
|---|---|---|
| **BLUE SKY ENDEAVORS, LLC and LAMOND FAMILY MEDICINE, P.L.L.C.,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | <u>**ORDER**</u> |
| **HENDERSON COUNTY HOSPITAL CORPORATION and BLUE RIDGE COMMUNITY HEALTH SERVICES, INC.,** | ) ) ) ) ) | |
| **Defendants.** | ) ) ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment [Doc. 78].

## I.    PROCEDURAL BACKGROUND

On April 6, 2023, the Plaintiff Blue Sky Endeavors, LLC ("Blue Sky Endeavors") initiated this action in Henderson County Superior Court, alleging that the Defendants Henderson County Hospital Corporation ("Pardee Hospital") and Blue Ridge Community Health Services, Inc. ("Blue Ridge") infringed Blue Sky Endeavors' trademark, and thereby engaged in unfair competition and unfair and deceptive trade practices.  [Doc. 1-1:

Complaint at 10-12]. Four days later, the Defendants removed the case to this Court. [Doc. 1 at ¶¶ 2–3]. After months of litigation, on February 28, 2024, Blue Sky Endeavors amended its Complaint to add LaMond Family Medicine, P.L.L.C. ("LFM") as a Plaintiff. [Doc. 26 at 1]. Together, the Plaintiffs assert claims for (1) federal trademark infringement, under 15 U.S.C. § 1114; (2) federal unfair competition, under 15 U.S.C. § 1125(a); and (3) unfair and deceptive trade practices, under N.C. Gen. Stat. § 75-1.1. [Doc. 26 at 9-11]. On March 12, 2024, the Defendants answered the Amended Complaint. [Doc. 28].[1]

The Plaintiffs moved for preliminary injunctive relief [Doc. 32], which the Court denied on October 21, 2024. [Doc. 67]. On January 31, 2025, the Defendants filed a Motion for Summary Judgment [Doc. 78].[2] On February 14, 2025, the Plaintiffs filed a Response to the Defendants' Motion [Doc. 80], and on February 28, 2025, the Defendants filed a Reply [Doc. 84]. This matter is now ripe for disposition.

---

[1] The Defendants also asserted a Counterclaim for a declaration that the Plaintiffs fraudulently procured and renewed the trademark. [Id.]. That Counterclaim, however, was dismissed on motion by the Plaintiffs. [Doc. 65].

[2] The Defendants also filed a Motion in Limine to exclude one of the Plaintiffs' designated experts as well as a patient survey. [Doc. 79]. That motion is addressed by way of a separate Order.

2

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.  The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 56).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Id. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  Id. at 324.  Rather, the nonmoving party must oppose a summary judgment motion with citations to "depositions, documents, electronically stored information, affidavits or declarations,

3

stipulations . . . admissions, interrogatory answers, or other materials" in the record. Fed. R. Civ. P. 56(c)(1)(A). Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To that end, a court may only consider material that can be reduced to admissible evidence. Kennedy v. Joy Technologies, Inc., 269 F. App'x 302, 308 (4th Cir. 2008) (citing Md. Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991)); see also Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

When ruling on a summary judgment motion, a court must view the evidence and any inferences therefrom in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). As the Supreme Court has emphasized,

> when the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an

4

otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Id. (citations, alterations, and quotation marks omitted).

## III. FACTUAL BACKGROUND

### A. The Plaintiffs

The evidence regarding the background of the parties is undisputed.

Blue Sky Endeavors is a North Carolina limited liability company that owns the registered trademark "BLUE SKY MD" (registration no. 4126220) (hereinafter "BLUE SKY MD" or the "Plaintiffs' Mark"). [Doc. 32-4: Trademark Assignment; Doc. 32-5: Trademark Registration]. BLUE SKY MD is registered for use with the following:

> Medical clinic providing weight loss solutions, services and programs, nutrition counseling, hormone therapy, including, bioidentical hormone replacement, anti-aging therapy, and natural hormone therapy, medical aesthetic procedures, including, laser hair removal, laser peels, botulinum toxin treatments, microdermabrasion, liposuction, vein treatments, vein therapy, cellulite treatments, body contouring treatments, injectable filler treatments, facials, and skin care[.]

[Doc. 32-3: Trademark Application at 2].

5

Blue Sky Endeavors licenses the BLUE SKY MD mark to LFM "to provide weight control solutions and hormone therapy."  [Doc. 45-3: Trademark License at 1].  David LaMond ("Dr. LaMond") is a partial owner of both Blue Sky Endeavors and LFM.  [Doc. 32-6: LaMond Decl. at ¶ 8].

LFM provides healthcare services in the Western North Carolina area surrounding Henderson and Buncombe Counties.  Dr. LaMond opened LFM in 2004, and he began using the mark BLUE SKY MD in 2008.  [Doc. 32-6: LaMond Decl. at ¶¶ 3-6].  LFM offers differing services under three different brands: Blue Sky MD, DermaBlue, and Blue Sky MD Health.  [Doc. 45-2: Hunter Dep. at 14, 144].  DermaBlue offers aesthetic skincare and laser hair removal services.  [Id. at 15].  Blue Sky MD provides weight loss and hormone therapy services.  [Id. at 16; Doc. 44-12: Trademark Renewal at 7].  Blue Sky MD Health, which prior to a rebranding effort in March 2020 was still known as LFM, offers primary care services.  [Doc. 45-2: Hunter Dep. at 19, 21, 280-81].  All three brands, however, fall under the umbrella of LFM, and the "main brand" of LFM is the mark BLUE SKY MD.  [Doc. 45-2: Hunter Dep. at 14].  According to Dr. LaMond, LFM is synonymous with BLUE SKY MD. [Doc. 32-6: LaMond Decl. at ¶ 6]. Third parties also recognize LFM through the BLUE SKY MD mark, [Doc. 33-3: Allison Dep. at 17–18], and

LFM employees refer to LFM as "Blue Sky MD," [Doc. 33-4: Nanney Dep. at 84].

According to Jake Hunter, LFM's president, LFM offers various services, including dermatology, hormone therapy, weight management, and traditional primary care. [Doc. 45-2: Hunter Dep. at 14-16]. "At a high level," though, BLUE SKY MD is associated with hormone therapy and weight management. [Id. at 16]. Under BLUE SKY MD, LFM markets itself as a "medical weight loss clinic," as evidenced by its webpage:



[Doc. 26 at 3, Fig. 1].[3]

---

[3] In addition to the stylized version of the Mark as seen in Figure 1, the Plaintiffs' Mark also appears in plain text in web browser searches as "Blue Sky MD." [See, e.g., Doc. 80-2: Web Search Results].

Nonetheless, LFM offers a "comprehensive plan" under the mark BLUE SKY MD, as services like hormone therapy and weight management go "hand in hand" with LFM's "traditional primary care" services. [Doc. 45-2: Hunter Dep. at 16]. LFM does not offer a sliding fee schedule or see patients regardless of their ability to pay. [Doc. 45-2: Hunter Dep. at 72]. If a patient is uninsured or unable to self-pay, LFM will likely refer that patient to the Defendant Pardee Hospital or the Defendant Blue Ridge. [Id. at 72-73].

**B.    The Defendants**

Defendant Pardee Hospital is a not-for-profit healthcare system founded in 1953 and managed by UNC Health. [Doc. 44-5: Reed Decl. at ¶ 3]. Defendant Blue Ridge is a Federally Qualified Health Center ("FQHC"), which is a non-profit, community-based health organization that provides high-quality healthcare services to both insured and uninsured patients. [Id. at ¶ 5, 7-8; Doc. 78-2: Hudspeth Decl. at ¶ 3]. The U.S. Health Resources and Services Administration ("HRSA") administers the FQHC program to allow for the provision of primary and preventive health care services regardless of a patient's ability to pay. [Doc. 44-5: Reed Decl. at ¶¶ 7-8; Doc. 78-2: Hudspeth Decl. at ¶ 6].

Pardee Hospital operates a primary care physician network ("PCPN") that offers primary care services, including physical exams, preventative

care, and internal medicine, throughout Western North Carolina. [Doc. 44-5: Reed Decl. at ¶¶ 4, 35]. In 2022, Pardee Hospital and Blue Ridge agreed to make Pardee Hospital's PCPN unit a sub-recipient of Blue Ridge's FQHC status. [Id. at ¶¶ 6-9; Doc. 78-2: Hudspeth Decl. at ¶ 8]. Pardee Hospital solely operates this unit, and Blue Ridge is not involved with the operations of the PCPN. [Doc. 44-5: Reed Decl. at ¶¶ 10, 12; Doc. 78-2: Hudspeth Decl. at ¶10].

Pardee Hospital is solely responsible for the branding and marketing of the unit, including choosing the unit's name, "Pardee BlueMD." [Doc. 44-5: Reed Decl. at ¶ 12; Doc. 78-2: Hudspeth Decl. at ¶ 13]. Below is an image of the PARDEE BLUEMD mark as it appears both in Pardee Hospital's advertising materials as well as in web browser searches:

## Pardee BlueMD

[Doc. 26: Am. Complaint at 7 Fig. 7; see also Doc. 44-11: Pardee Advertising Materials at 2]. Pardee Hospital chose the mark PARDEE BLUEMD (1) to emphasize the long-standing Pardee brand, (2) to describe its geographic location in the Blue Ridge Mountains, and (3) to reference its relationship with UNC Health (i.e., "Carolina Blue"). [Doc. 44-5: Reed Decl. at ¶ 16]. The Plaintiffs' BLUE SKY MD mark was not a factor in this decision, and neither Pardee Hospital nor Blue Ridge Health views the marks as confusingly

similar or likely to cause confusion among consumers. [Id. at ¶¶ 17, 21; Doc. 78-2: Hudspeth Decl. at ¶ 15]. Pardee Hospital began using its PARDEE BLUEMD mark on September 1, 2022, and always presents itself to the public as Pardee BlueMD.[4] [Doc. 44-5: Reed Decl. at ¶¶ 22, 49; Doc. 33-2: MacMilliam Dep. at 44]. Pardee BlueMD is the only name authorized to market the Pardee Hospital PCPN. [Doc. 44-5: Reed Decl. at ¶ 49].

Johnna Reed is both the chief administrative officer and chief executive officer of Pardee Hospital, and she chose the PARDEE BLUEMD mark. [Doc. 45: Reed Decl. at ¶¶ 2, 15]. Pardee Hospital's marketing director, Somer Lorenz, told Reed that "marketing under just the name 'BlueMD' might be a mistake." [Id. at ¶ 18]. Lorenz told Reed that she did not recommend using "BlueMD since you have Blue Sky MD and Blue Sky Health MD in this

---

[4] The Plaintiffs contend, as they did at the preliminary injunction stage, that Pardee Hospital also holds itself out to the public as "Blue MD." [See Doc. 80 at 3 n.4]. The Plaintiffs make only passing reference to "Blue MD" in the allegations of their Amended Complaint, and all of the infringement claims asserted therein are premised on the Defendants' use of the mark PARDEE BLUEMD. [Doc. 26: Am. Complaint at ¶¶ 19, 48, 63]. In arguing that the Defendants have also infringed by the use of the mark BLUE MD, the Plaintiffs primarily rely on the deposition testimony of Virginia Boren, Dr. LaMond's mother-in-law. Ms. Boren testified that when she called the office of a doctor associated with Pardee Hospital, the person who answered the phone identified the office as "Blue MD." [Doc 38-2: Boren Dep. at 85-86]. However, one isolated incident of an unidentified employee referring to the practice as "Blue MD" and not "Pardee BlueMD" does not create a triable issue as to whether the Defendants were holding themselves out to the public as "Blue MD." The other circumstantial evidence cited by the Plaintiffs—including the Defendants' internal communications and evidence of keywords used in Google searches—also fails to create a triable issue as to whether the Defendants held themselves out as "Blue MD." As such, the Court will address only Pardee Hospital's use of the mark PARDEE BLUEMD.

area." [Doc. 33-6: Lorenz emails at 2–3].  Lorenz, however, "had no objection or concern related to calling the FQHC primary care physician network 'Pardee BlueMD.'" [Doc. 44-5: Reed Decl. at ¶ 18].

Erica Allison works for a company called "Formation," which "is a strategic communications agency that offers both public relations and branding services." [Doc. 33-3: Allison Dep. at 10–11].  Among other things, Formation consults clients concerning possible logo designs. [Id. at 11–12]. Through Formation, Allison has worked for both LFM and Pardee Hospital; LFM is a former client, and Pardee Hospital is a current client. [Id. at 16]. Concerning her work for Pardee Hospital, Allison's "lane was not about branding and naming. [Her] role was about PR." [Id. at 37].  Even so, Allison had "concerns" about the PARDEE BLUEMD mark, and she expressed her concerns to Lorenz. [Id.].  Nonetheless, Pardee Hospital began operating under the PARDEE BLUE MD mark on September 1, 2022. [Doc. 44-5: Reed Decl. at ¶ 22].

### C.    Evidence of Confusion

The Plaintiffs have presented the following forecast of evidence regarding confusion:

(1)    Kathryn Lewis, a friend of Dr. LaMond and a patient of LaMond Family, attempted to search for Blue Sky MD on

11

Google to schedule an appointment. When she searched for Blue Sky MD she was first shown Pardee BlueMD. Her first reaction was that she believed that Pardee had "joined partnerships" Blue Sky MD or Pardee "probably bought out [Blue Sky MD]." [Doc. 32-15: Lewis Dep. at 53]. However, wanting to make sure she was going to call the right place, she decided to scroll down through the search results to find a number that was associated with Blue Sky MD. Until she found the Blue Sky MD website, she believed that the Plaintiffs had been bought by Defendants. [Id. at 52-55].

(2) Ms. Lewis discussed that she had also talked to a friend who expressed their confusion about BLUE SKY MD and PARDEE BLUEMD, even having the same thing happen to her friend. [Id. at 37].

(3) Virginia Boren, a former patient of LFM and Dr. LaMond's mother-in-law, testified that when she first saw PARDEE BLUEMD, she believed that her son-in-law had sold his practice to the Defendants. [Doc. 32-8: Boren Dep. at 40]. She was confused until she talked to Dr. LaMond and was

12

the first to inform him of the Defendants' allegedly infringing mark.  [Id. at 40-42].

(4)　Holley Nanney, a LFM employee, testified that she received a handful of phone calls from clients expressing confusion.  [Doc. 33-4: Nanney Dep. at 74-75, 84; see also Doc. 32-16].  One in particular was attempting to call the Defendants but called Blue Sky MD instead.  [Id.].

(5)　Christina Jones testified that even though she worked for LFM she thought that the Defendants had purchased the Plaintiffs due to their use of PARDEE BLUEMD mark. [Doc. 33-1: Jones Dep. at 120-22].

(6)　Ms. Jones also testified to having to instruct the employees under her at LFM on how to respond to clients' confusion over PARDEE BLUEMD and their perceived association with the BLUE SKY MD mark and the Plaintiffs.  [Id. at 41-42].

(7)　Ms. Jones testified that a Greensboro medical facility sent a request for release of medical records to the Defendants instead of LFM.  An agent of the facility called Ms. Jones multiple times claiming that she had pulled the fax number

13

from the Plaintiffs' website. Upon Ms. Jones plugging in the alleged fax number while talking to the agent, it was discovered that the fax number was of the Defendants and the agent of the facility immediately responded that the Defendants were deceptively taking the Plaintiffs' name. [Id. at 111-12].

(8)     Ms. Jones further testified that she had one encounter where a client wanted to terminate services with LFM due to his perception that the practice had been acquired by Pardee Hospital; after Ms. Jones explained that LFM was still a privately-owned entity, he agreed to stay as a patient of LFM.  [Id. at 112-14].

(9)     Ms. Jones also testified that one person called LFM looking for a specific provider who was no longer employed at LFM and who now worked at Pardee BlueMD.  [Id. at 114-15].

(10)   Ms. Jones testified that family members and multiple people in the community had asked her questions about LFM being bought by the Defendants.  [Id. at 41-42, 116-17].

(11) Dr. LaMond had a text exchange with one of the Defendants' employees working under the PARDEE BLUEMD mark wherein Dr. LaMond asked if there had been "any brand confusion on your end" and the employee responded, "Yes, when I was told of the name change I had concerns . . . . Even in the office I'm having to still explain things[.]" [Doc. 33-7: Text exchange between Kevan Hansel and Dr. LaMond].

(12) Jake Hunter testified to having believed that Pardee Hospital might have purchased the Plaintiffs without Dr. LaMond telling him due to the Defendants' Mark. [Doc. 32-14: Hunter Aff. at ¶ 16].

(13) Dr. LaMond testified that at least 40 random people outside of LFM who had seen the Defendants' Mark asked him about the Defendants acquiring LFM. [Doc. 32-6: LaMond Aff. at ¶ 15].

(14) When David LaMond was entering Pardee Hospital for back surgery after a year from the announcement of the Defendants' use of the PARDEE BLUEMD and months after the Plaintiffs had filed suit against the Defendants, the

15

check-in staff at Pardee was asking him about how he was doing after Pardee had purchased the Plaintiffs. [Id.]. This individual did not know that the PARDEE BLUEMD mark was not associated with the Plaintiffs' Mark. Additionally, before the anesthesia was administered, the anesthesia nurses also asked Dr. LaMond about how he was doing after Pardee had purchased the Plaintiffs. [Id. at ¶ 16]. To Dr. LaMond, these individuals appeared to genuinely believe that the Defendants' PARDEE BLUEMD mark was associated with the Plaintiffs' Mark, even though they worked for Pardee and should otherwise know that it was not. [Id. at ¶¶ 15-16].

(15) In June of 2024, Dr. LaMond called four facilities bearing the Defendants' Mark and asked whether they were getting people asking if they were Blue Sky MD a lot and three of the four individuals he spoke to responded in the affirmative. [Id. at ¶ 18].[5]

[Doc. 80: Pltfs' Resp. at 14-19].

---

[5] The Plaintiffs also submitted evidence of a client survey conducted by LFM. The Court, however, by way of a separate Order has excluded this survey from consideration due to its inherent unreliability.

Additionally, the Plaintiffs have presented a forecast of evidence of a February 13, 2025 Google search of "Blue MD in Hendersonville." [Doc. 80-2 at 1]. Pardee Hospital's website populates the screen as "Pardee BlueMD," along with a blue icon that reads "UNC Health." [Id.]. Attached to the website is the following description: "Pardee Internal Medicine Associates in Hendersonville provides primary care services for adults of all ages." [Id.]. In the same search, one of LFM's websites populates the screen as "Blue Sky MD Health," along with an icon of the Plaintiffs' Mark, and attached to its website is the following description: "Hendersonville's Trusted Primary Care Doctor Providing Exceptional Traditional & Integrative Methods for patients of all walks of life." [Id. at 1]. Another one of LFM's websites populates the screen as "Blue Sky MD," along with an icon of the Plaintiffs' Mark, and attached to its website is the following description: "Our weight loss clinic in Hendersonville, NC is the key. We provide medical weight loss and hormone therapy services in a safe, supportive medical setting." [Id. at 2].

## IV.    DISCUSSION

### A.    Federal Trademark Claims

The Plaintiffs assert claims for trademark infringement under 15 U.S.C. § 1114 and unfair competition under 15 U.S.C. § 1125. [Doc. 26 at 9–11].

17

These claims share the same elements.  People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir. 2001) (citing 15 U.S.C. §§ 1114, 1125(a) and Lone Star Steakhouse & Saloon v. Alpha of Va., Inc., 43 F.3d 922, 930 (4th Cir.1995)).[6]  Thus, both claims require a plaintiff to prove (1) "that it owns a valid and protectable mark" and (2) "that the defendant's use of a 'reproduction, counterfeit, copy, or colorable imitation' of that mark creates a likelihood of confusion."  See CareFirst of Md., Inc. v. First Care, P.C., 434 F.3d 263, 267 (4th Cir. 2006) (citing 15 U.S.C. § 1114(1)(a) and Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc., 130 F.3d 88, 91 (4th Cir. 1997)).

Here, it is undisputed that the Plaintiffs own a valid and protectable mark; thus, the only issue that remains is whether the Plaintiffs have presented a forecast of evidence that Pardee Hospital's use of the PARDEE BLUEMD mark is likely to cause confusion with the Plaintiffs' BLUE SKY MD mark.

"Trademark law protects trademarks from a likelihood of confusion caused by an infringing mark regardless of whether actual confusion was caused and regardless of whether those likely to be confused were actual

---

[6]The difference between § 1114 and § 1125 is that the former is limited to infringement of "registered" marks, and the latter is not.  See 15 U.S.C. §§ 1114(1), 1125(a).

customers or only potential customers.  And the trademark owner need not show that the likelihood of confusion caused any actual loss of sales."  Westmont Living, Inc. v. Ret. Unlimited, Inc., -- F.4th --, 2025 WL 838395, at *5 (4th Cir. Mar. 18, 2025).  Further, "an actionable likelihood of confusion can relate 'not only as to source, but also as to affiliation, connection or sponsorship.'"  Id.  The Fourth Circuit considers nine factors to discern whether confusion is likely:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

RXD Media, LLC v. IP Application Dev. LLC, 986 F.3d 361, 373 (4th Cir. 2021) (citations omitted).  "These 'factors are not always weighted equally, and not all factors are relevant in every case.'"  Rosetta Stone Ltd v. Google, Inc., 676 F.3d 144, 154 (4th Cir. 2012) (quoting Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 259 (4th Cir. 2007)).  Therefore, courts should only analyze the relevant factors.  Id. at 154 (citing Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984)).  Moreover, these factors are not a "rigid formula."  Anheuser–Busch, Inc. v. L & L Wings,

*Inc.,* 962 F.2d 316, 320 (citing <u>Murphy v. Provident Mut. Life Ins. Co.,</u> 923 F.2d 923, 928 (2d Cir. 1990) and <u>Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,</u> 799 F.2d 867, 872 (2d Cir. 1986)).  Instead, these factors are "a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion."  <u>Id.</u>

As the Court previously noted in denying the Plaintiffs' request for a preliminary injunction, several of the <u>RXD</u> factors—including the similarity of the parties' facilities, the advertising used by the markholders, and the sophistication of the consuming public—are not relevant to the present inquiry.  [Doc. 67 at 16 n.6].  As such, the Court will only address the remaining factors.

### 1.    Strength of the Plaintiffs' Mark

"Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark."  <u>George & Co. LLC v. Imagination Entertainment Ltd.</u>, 575 F.3d 383, 393 (4th Cir. 2009) (citing <u>CareFirst</u>, 434 F.3d at 269).  A mark's strength is determined by its "distinctiveness."  <u>See</u> <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 769 (1992).  A mark is distinctive if it "(1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning."  <u>Id.</u>  A mark's inherent distinctiveness, or "conceptual strength," is "determined in part by its

placement into one of four categories of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." George & Co., 575 F.3d at 393–94 (citing Pizzeria Uno, 747 F.2d at 1527).

Generic marks merely state what the underlying product is, and they are not distinctive. Id. at 394. "Examples of generic marks are bleach, copiers, cigarettes, and cars." Id. On the opposite end of the spectrum are arbitrary marks and fanciful marks, both of which are inherently distinctive. Id. As examples, Apple computers have an "arbitrary" mark because the mark is random; Kodak cameras have a "fanciful" mark because the mark is invented. See id. (citing Sara Lee Corp. v. Kayser–Roth Corp., 81 F.3d 455, 464 (4th Cir. 1996)). Suggestive marks are also inherently distinctive. Id. Suggestive marks suggest the product that they represent, requiring an observer to exercise some imagination in order to associate the mark with its product. Id. "Orange Crush soda," for example, has a suggestive mark. Id. (citing Sara Lee, 81 F.3d at 464).

Descriptive marks are not inherently distinctive, Two Pesos, Inc., 505 U.S. at 769; they merely describe the product they represent, George & Co., 575 F.3d 394. For example, "5 Minute glue" has a descriptive mark. Id. A descriptive mark can become distinctive, however, by acquiring a "secondary meaning." Two Pesos, Inc., 505 U.S. at 769. A mark has secondary

meaning if the public understands "that the mark, when used in context, refers, not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify." Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990). To make this determination, a court should consider: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." Id.

Here, the Plaintiffs' Mark is BLUE SKY MD. The Plaintiffs' Mark is not generic because it does not simply state what the underlying product is. See George & Co., 575 F.3d at 394. The Plaintiffs' Mark is not fanciful because it is not an imaginary word like "Kodak." See id. Rather, the Plaintiffs' Mark is a combination of descriptive and arbitrary. It is descriptive insofar as "MD" describes the underlying service, healthcare provided by medical doctors, and it is arbitrary insofar as "blue sky" has no clear relationship with healthcare. See id. Regardless, the Plaintiffs' Mark has some minor distinctiveness through secondary meaning because when it is used in Western North Carolina [see Doc. 32-6: LaMond Aff. at ¶ 6; Doc. 33-3: Allison Dep. at 17–18; Doc. 33-4: Nanney Dep. at 84], some members of the public

who have otherwise become familiar with the services that the Plaintiffs provide understand the Mark to refer to the Plaintiffs' particular practice.

However, any strength the Plaintiffs' Mark may have is diminished because third parties in the medical field regularly use portions of the Plaintiffs' Mark within their own marks. See CareFirst, 434 F.3d at 270. "MD" is a ubiquitous initialism in the medical field, and "blue" is a color closely associated with two medical schools in this state: those at the University of North Carolina at Chapel Hill and Duke University. Indeed, UNC Health is Pardee Hospital's administrative partner. [Doc. 44-5: Reed Decl. at ¶ 16]. The Fourth Circuit has also stated that Blue Cross Blue Shield—a large health insurance provider—has a "prominent mark" in the healthcare industry. CareFirst, 434 F.3d at 271. Moreover, numerous businesses in this region, including the Defendant Blue Ridge Community Health Services, Inc., have "blue" in their name because of this region's connection to the Blue Ridge Mountains. [See Doc. 44-5: Reed Decl. at ¶ 16]. Accordingly, although the Plaintiffs' Mark has some strength, it has diminished distinctiveness in the healthcare field, and it has diminished distinctiveness in this region. As such, the Plaintiffs' Mark is relatively weak.

## 2. Similarity of Marks

Regarding the similarity of marks, courts should "focus on whether there exists a similarity in sight, sound, and meaning which would result in confusion." George & Co., 575 F.3d at 396 (citing Pizzeria Uno, 747 F.2d at 1534–35). In so doing, the Court "must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer." CareFirst, 434 F.3d at 271.

The Court begins with examining the parties' stylized marks as they are commonly used in the parties' advertisements and signage. In the stylized version of the Plaintiffs' Mark, "blue sky" is lowercase, the stem of the "b" is fragmented, and "MD" is a separate word written in superscript. In the stylized PARDEE BLUEMD Mark, "Pardee Blue" is written with only initial capital letters, no letters are fragmented, and there is no space between the "BLUE" and the "MD." The marks are also in different fonts. There is, therefore, very little similarity in the sight, sound, and meaning between the Plaintiffs' stylized Mark and the Defendants' Mark as it is commonly used in advertisements and signage.

The other variations of the parties' marks, such as the manner in which the marks appear in web browser searches,[7] also share little similarity. Both

---

[7] [See, e.g., Doc. 26: Am. Complaint at ¶ 14, Fig. 2; Doc. 80-2: Web Search Results].

marks contain the word "blue" and the initialism "MD"; however, given the use of the words "blue sky" in the Plaintiffs' Mark and "Pardee" in the Defendants' Mark and the difference in spacing between the terms "blue" and "MD" within each mark, the marks contain more dissimilarities than similarities. Additionally, in the case of web search results, the name "Blue Sky MD" is accompanied by a small image of the stylized BLUE SKY MD mark, and the name "Pardee Blue MD" is accompanied by a small image of the UNC Health logo, as well as a heading associating Pardee Blue MD with Pardee Hospital. [See Doc. 80-2: Web Search Results at 1].

### 3. Similarity of Services

Similarity of services identified by competing marks increases the likelihood of confusion. See George & Co., 575 F.3d at 397. Although services need not "be identical or in direct competition with each other" in order to be "similar," id. (citing CAE, Inc. v. Clean Air Eng'g, Inc., 267 F.3d 660, 679 (7th Cir. 2001)), services are not "similar" simply because they have some overlap, CareFirst, 434 F.3d at 272 (citing Petro Stopping Ctrs., L.P., 130 F.3d at 95).

The Plaintiffs have presented a forecast of evidence that LFM provides primary care services under the name "Blue Sky MD Health." While LFM offers some traditional primary care services, the undisputed forecast of

evidence demonstrates that "[a]t a high level," the BLUE SKY MD mark is primarily associated with hormone therapy and weight management. [Doc. 45-2: Hunter Dep. at 14-16]. Further, LFM does not offer a sliding fee schedule or see patients regardless of their ability to pay; if a patient is uninsured or unable to self-pay, LFM will likely refer that patient to Pardee Hospital or Blue Ridge. By contrast, Pardee Hospital is a nonprofit hospital providing comprehensive healthcare services to residents throughout Western North Carolina, regardless of their ability to pay. Therefore, while there is some overlap between the parties' services, the limited services offered by LFM under the BLUE SKY MD mark are unlike the extensive services offered by Pardee Hospital under the PARDEE BLUEMD mark.

### 4. The Defendants' Intent

Intent "is a 'major' factor because '[i]f there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." George & Co., 575 F.3d at 397 (alteration in original) (citing Pizzeria Uno, 747 F.2d at 1535).

Here, the Defendants have presented a forecast of evidence that Pardee Hospital adopted the PARDEE BLUEMD mark after it became a sub-

26

recipient of Blue Ridge's FQHC status.  [Doc. 44-5: Reed Decl. at ¶ 15].

Pardee Hospital announced its name change through its website, where it

simultaneously announced its partnership with Blue Ridge.  [Doc. 26-2 at 1].

Pardee Hospital chose the PARDEE BLUEMD mark to capitalize "on the

over 70 years of recognition that people in the region have regarding Pardee

and medical services," to reference the Blue Ridge Mountains of Western

North Carolina, and to reference "Carolina Blue," which is associated with

Pardee Hospital's administrative partner, UNC Health.  [Doc. 44-5: Reed

Decl. at ¶ 16].  By contrast, the Plaintiffs have not presented a forecast of

evidence from which a jury could reasonably conclude that Pardee Hospital's

true intent in adopting its mark was to confuse consumers.  As such, this

factor weighs in favor of the Defendants.

### 5.  Actual Confusion

"[A]ctual confusion is the most important factor in determining

'likelihood of confusion' in trademark infringement claims.  RXD Media, LLC,

986 F.3d at 373.  The Fourth Circuit analyzes evidence of actual confusion

through the eyes of "the ordinary customer."  Lamparello v. Falwell, 420 F.3d

309, 316 (4th Cir. 2005) (quoting Anheuser–Busch, 962 F.2d at 319).  "Actual

confusion can be demonstrated by both anecdotal and survey evidence."

George & Co., 575 F.3d at 398.  Evidence of only a few instances of actual

confusion, however, may be dismissed as de minimis.  George & Co., 575 F.3d at 398.

Here, the Plaintiffs cite a handful of instances of apparent confusion by non-consumers.  [See Doc. 80: Pltfs' Resp. at 14-19 (examples 5, 7, 10, 11, 12, 14, and 15)].  For example, both Christina Jones, a LFM employee, and Jake Hunter, LFM's President, testified that they thought that Pardee Hospital had purchased LFM due to Pardee's use of the PARDEE BLUEMD mark (examples 5, 12).  The temporary confusion of an employee or even a company's officer, however, is not relevant to the actual confusion inquiry. Non-consumer confusion can be relevant "if it can be shown that *public confusion* will adversely affect the plaintiff's ability to control his reputation among its laborers, lenders, investors, or other group with whom plaintiff interacts."  Georgia Pac. Consumer Products, LP v. Von Drehle Corp., 618 F.3d 441, 453 (4th Cir. 2010) (citation and internal quotation marks omitted) (emphasis added); Dynamic Aviation Grp. Inc. v. Dynamic Int'l Airways, LLC, No. 5:15-CV-00058, 2016 WL 1247220, at *23 (W.D. Va. Mar. 24, 2016) (noting non-consumer "confusion is relevant when it exists in the minds of persons in a position to influence the purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner") (quoting Beacon Mut. Ins. Co. v. OneBeacon Ins.

28

Group, 376 F.3d 8, 10 (1st Cir. 2004)). Anecdotal, hearsay evidence of confusion on the part of employees or others closely associated with the subject brand "does not suffice to raise a genuine issue of material fact as to consumer confusion, especially given that this inquiry focuses on the consuming public as a whole, not interested parties already familiar with the plaintiff's mark through personal connections." Gameologist Grp., LLC v. Scientific Games Int'l, Inc., 838 F.Supp.2d 141, 162 (S.D.N.Y.2011), aff'd, 508 F. App'x 31 (2d Cir. 2013).

Some of the cited instances of non-consumer confusion involve Dr. LaMond's interactions with unidentified persons who were purportedly employed by Pardee Hospital in some capacity (examples 11, 14, 15). Again, these are non-consumers. Moreover, these statements are not admissions of a party opponent. Dr. LaMond's testimony regarding these individuals' statements, offered without any evidence of their authority to make such statements, is inadmissible hearsay that cannot be considered on summary judgment. Rule 801(d); See Lyons v. City of Alexandria, 35 F.4th 285, 290 n.4 (4th Cir. 2022) ("Hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."). Dr. LaMond's testimony regarding questions posed by random members of the

community (example 13) are likewise hearsay and therefore inadmissible.[8] Similarly, Ms. Jones's recounting of the statements of an unidentified employee of a Greensboro medical facility concerning a misdirected fax[9] (example 7) and her testimony regarding questions posed by her family and members of the community (example 10) are inadmissible. As such, the forecast of evidence presented by the Plaintiffs regarding the confusion of non-consumers fails to support an inference of actual confusion.

The Plaintiffs also cite several instances of purported consumer confusion. [Doc. 80: Pltfs' Resp. at 14-19 (examples 1, 2, 3, 4, 6, 8, 9,)]. The alleged confusion of Katheryn Lewis (example 1) is an example of initial-interest confusion, which was quickly dispelled upon closer examination of her web search results. See Passport Health, LLC v. Avance Health Sys., 823 F. App'x 141, 150 (4th Cir. 2020) (rejecting initial-interest confusion theory and noting that allegedly infringing advertisement must be considered "in conjunction with the website to which it links"). Moreover, Ms. Lewis's statements regarding the purported confusion of her friend (example 2) are inadmissible hearsay.

---

[8] See footnote 10, *infra.*

[9] The Greensboro medical facility example is particularly inapplicable since the "confused" party—another individual working in the healthcare field—apparently obtained the information from the internet and simply did not read the website very closely. Thus, any "confusion" arose from sheer inattentiveness rather than any similarity of the marks.

The purported confusion of Ms. Boren (example 3) is, at best, de minimis evidence of actual confusion. Ms. Boren, who is Dr. LaMond's mother-in-law, testified that she believed her son-in-law had sold his practice to Pardee when she first saw the PARDEE BLUEMD mark, but that this confusion was cleared up as soon as she spoke to her son-in-law about the issue. In any event, "[c]ourts have recognized that actual confusion evidence from friends and family does not accurately represent the consuming public." Fuel Clothing Co. v. Nike, Inc., 7 F. Supp. 3d 594, 622 (D.S.C. 2014).

The remaining instances cited (example 4, 6, 8, 9) are statements of LFM employees regarding clients calling LFM and purportedly expressing confusion regarding an association between the two entities. Such statements are also inadmissible hearsay.[10] Even if such statements could be considered, however, they constitute de minimis evidence of actual confusion, as the clients were not so confused as to be misdirected to the Defendants and any temporary confusion was immediately dispelled. See George & Co., 575 F.3d at 398 (affirming grant of summary judgment and

---

[10] It does not appear that any of these statements would fall within the hearsay exception for present sense impression, as there is nothing to indicate that the declarant was describing his or her confusion "while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). Further, it does not appear that any of these statements would qualify as a statement of a then-existing mental condition, as the Plaintiffs have not shown that these statements were anything more than "a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3). The Plaintiffs make no argument as to how they would propose to offer this evidence at trial.

noting that "[e]vidence of only a small number of instances of actual confusion may be dismissed as *de minimis.*").

In sum, the Court finds that only some of the RXD factors tilt slightly in favor the Plaintiffs, but the majority of the factors clearly favor the Defendants. Moreover, the most significant factor—actual confusion—weighs decidedly in the Defendants' favor. Given the weakness of the BLUE SKY MD mark, the lack of similarity between the marks, the lack of evidence of any predatory intent of the Defendants, and the lack of any real evidence of actual confusion, the Court concludes that no reasonable jury could conclude that there was a likelihood of confusion here. Even to the extent that the Plaintiffs showed some slight evidence on some of the RXD factors, such forecast is not enough to avoid summary judgment. See George & Co., 575 F.3d at 400 ("[W]e are aware of no case where a court has allowed a trademark infringement action to proceed beyond summary judgment where two weak marks were dissimilar, there was no showing of a predatory intent, and the evidence of actual confusion was *de minimis.*"). Accordingly, the Court hereby grants summary judgment in favor of the Defendants.

## B. State Law Claims

The Plaintiffs also assert a state law claim for unfair and deceptive trade practices pursuant to N.C. Gen. Stat. § 75-1.1. [Doc. 26: Am.

Complaint at 11-12]. As this claim is derivative of the Plaintiffs' federal trademark claims, this state law claim also fails for the reasons set forth above. Accordingly, the Defendants are granted summary judgment with respect to this state law claim as well.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 78] is **GRANTED**, and this action is hereby **DISMISSED WITH PREJUDICE**.

The Clerk of Court is respectfully directed to enter a Judgment consistent with this Memorandum of Decision and Order and close this civil case.

**IT IS SO ORDERED.**

Signed: April 15, 2025

Martin Reidinger
Chief United States District Judge

33